**In re MCKENZIE ENERGY CORP., U.S. Laplata Pipeline Company, Harven Michael McKenzie, Steven Darryl McKenzie, Timothy Stewart McKenzie, Debtors.**

Bankruptcy Nos. 95–47219–H5–7, 95–47220–H5–7, 95–48397–H2–7, 95–50153–H5–7, 95–48474–H4–7.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Dec. 4, 1998.

Steven G. Lossle, Salt Lake City, UT, Thomas W. Graves, Houston, TX, W. Steve Smith, Trustee, Houson, TX, for Debtors.

## ORDER GRANTING TRUSTEE'S THIRD AND FOURTH INTERIM FEE APPLICATIONS

KAREN KENNEDY BROWN, Bankruptcy Judge.

Before the Court are the objections to the trustee's counsel's Third and Fourth Interim Fee Applications. The three individual McKenzie debtors and EuroGas, Inc. object to these applications. A hearing was conducted and the Court ORDERS that the objections should be denied and the fee applications approved on an interim basis for the following reasons:

## I.

### The Fee Applications at Issue

W. Steve Smith, Trustee, has been appointed and is presently serving in each of the following cases:

| Debtor | Date of Filing |
|---|---|
| McKenzie Energy Corp., U.S. | September 20, 1995 |
| LaPlata Pipeline Company | September 20, 1995 |
| Harven Michael McKenzie | October 30, 1995 |
| Timothy Stewart McKenzie | November 1, 1995 |
| Steven Darryl McKenzie | December 27, 1995 |

These cases are being jointly administered by order of this Court entered June 13, 1996.

On May 6, 1996, the trustee filed applications to employ counsel nunc pro tunc in each of the cases. The trustee sought to employ the firm of Floyd, Smith & Rios, P.C., effective December 1, 1995, to advise him in all matters in connection with the bankruptcy cases. Pursuant to 11 U.S.C. § 327, the Court entered its orders on June 21, 1996, appointing applicant to serve as counsel for the trustee on an hourly basis, effective retroactively to December 1, 1995.

At issue are the third and fourth applications for interim compensation and expense reimbursement submitted by counsel for the trustee. Orders were entered in the jointly administered cases on applicant's first application for interim compensation and expense reimbursement for the period December 1, 1995 through August 31, 1996, allowing total fees of $97,940.00, plus application prepara-

tion of $2,282.50, and expense reimbursement of $9,830.50, which was allocated among and paid from the estates as follows:

| | |
|---|---|
| McKenzie Energy Corp., U.S. | $9,904.77 |
| LaPlata Pipeline Company | $9,904.77 |
| Harven Michael McKenzie | $46,222.26 |
| Timothy Stewart McKenzie | $22,010.60 |
| Steven Darryl McKenzie | $22,010.60 |

Orders were entered in the five cases on applicant's second application for interim compensation and expense reimbursement for the period September 1, 1996 through February 22, 1997, allowing total fees of $125,408.50, expense reimbursement of $29,-992.60, and application preparations of $2,502.50, totaling $157,903.60, to be allocated as hereinafter set forth. There were insufficient funds on hand to pay these approved fees and expense, as well as the approved fees and expenses of John R. Hafner & Associates ("Hafner") plus the projected fees and expenses of Smith & Henault, P.C. Therefore, the trustee paid approximately one-half of the approved fees of Hafner, $31,995.80, withheld approximately one half of the projected fees of Smith & Henault, P.C. for which application was to be made, and paid approximately one-half of applicant's fees, allocated among and paid from the estates as follows:

| Estate | Authorized | Actually Paid |
|---|---|---|
| McKenzie Energy Corp., U.S. | $ 5,000.00 | $ 2,374.87 |
| LaPlata Pipeline Co. | $ 5,000.00 | $ 2,374.87 |
| Harven Michael McKenzie | $70,000.00 | $33,248.13 |
| Timothy Stewart McKenzie | $38,951.80 | $18,501.07 |
| Steven Darryl McKenzie | $38,951.80 | $18,501.07 |

On April 8, 1998, W. Steve Smith filed his Third Application for Interim Compensation and for Reimbursement of Expenses for Services Rendered by Counsel for the Trustee for the Period February 23, 1997 through January 3, 1998 and Supporting Brief (the "Third Fee Application"). The Third Fee Application covers 2,136.10 hours and requests approval of $412,038.80 for services rendered by counsel for the trustee, as well as the sum of $37,447.78 for reimbursement of expenses, and the sum of $4,042.50 for preparation of the Third Fee Application. The trustee properly served notice of the hearing on the Third Fee Application. Harven Michael McKenzie, Timothy Stewart McKenzie, and Steven Darryl McKenzie (col-

lectively the "McKenzies" or the "debtors") and EuroGas, Inc. object to the application.

On September 4, 1998, the trustee filed Trustee's Fourth Application for Interim Compensation and for Reimbursement of Expenses for Services Rendered by Counsel for Trustee for the Period February 1, 1998 through August 21, 1998 (the "Fourth Fee Application") covering 1151.00 hours and requesting approval of $224,448.00 for services rendered by counsel for the trustee, as well as the sum of $32,670.01 for reimbursement of expenses, and the sum of $2,612.50 for preparation of the Fourth Fee Application. The trustee properly served notice of the hearing on the Fourth Fee Application Euro-Gas and the McKenzies object to this application as well. In addition, Frances McKenzie, the wife of Harven Michael McKenzie, joins in the objections.

Hearings were held on the Third Fee Application on May 7, August 19, August 20, and October 15, 1998. A hearing was held on the Fourth Fee Application on October 16, 1998. Evidence presented at any of the hearings on the Third Fee Application and Fourth Fee Application shall be considered for all purposes as to each.

## II.

### The Trustee's Burden in a Fee Application

■■■ The applicant bears the burden of proof in a fee application proceeding. *In re U.S. Gulf Corp.*, 639 F.2d 1197, 1207 (5th Cir.1981); *In re Evangeline Refining Co.*, 890 F.2d 1312 (5th Cir.1989). Any professional employed by the trustee must meet the requirements of 11 U.S.C. § 327, that is, be disinterested and hold no adverse interest to the estates. Consequently, the trustee must demonstrate that his counsel has no conflict of interest that would impair the representation of the estate. *In re Kendavis Industries Intern., Inc.*, 91 B.R. 742 (Bankr. N.D.Tex.1988). In addition, all fee applications must comply with Rule 2016 of the Bankruptcy Local Rules for the Southern District of Texas which states in part:

(a) Applications for compensation shall cover each element in FRBP 2016 and

*In re First Colonial Corp. of America,* 11 CBC 133, 544 F.2d 1291, (5th Cir. 1977), except for Chapter 13 fee applications which must comply instead with BLR 3020(e).

. . . . .

(d) In the court-required form, applications shall include a detailed description of:

(1) Services by date and person for whom compensation is sought;

(2) Expenses, except charges for copies, postage, messengers, and similar expenses may be summarized if the basis for the summary is clearly shown, for example, the charge per copy;

(3) Each major task, the reason for necessity for performance of that task, the results obtained or anticipated, and the outcome or result had the task not been performed; approximate time devoted by each person for whom compensation is sought for each task; and reason why such expenditure of time was necessary for performance of each major task . . .

■■■ The Fifth Circuit in *In re First Colonial Corp. of America,* 544 F.2d 1291, applied its opinion in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19, to the trial judge's review of fees in a bankruptcy case. Specifically, the trial judge "must consider the following twelve factors in awarding attorneys' fees:"

(1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases.

. . . . .

Once the nature and extent of the services rendered have been determined, the bankruptcy judge must assess the value of those services.

*In re First Colonial Corp.*, 544 F.2d at 1297–98.

## III.

## The Parties

Harven Michael McKenzie (Michael McKenzie) and his family comprised of his sons, Steven and Timothy, and his wife, Frances, owned and/or operated approximately forty companies prior to filing bankruptcy. Some McKenzie companies were involved in domestic gas exploration and some involved in international gas exploration.

One of the McKenzie companies, McKenzie Methane Corporation (MMC), a Texas corporation, was involved in gas exploration and production in the San Juan Basin area of New Mexico and Colorado and the Black Warrior field in Alabama.[1] MMC filed Chapter 11 on April 20, 1994, Case No. 94–42758, and a creditor's plan proposed by Kukui, Inc. was confirmed by the bankruptcy court on July 6, 1995. Pursuant to the confirmed plan of reorganization, MMC is represented by Kukui, a Texas corporation and the largest MMC creditor.[2] Kukui has filed claims on behalf of itself or MMC amounting to 75%–80% of all filed claims in the five McKenzie bankruptcies jointly administered by Steve Smith, Chapter 7 Trustee.

EuroGas, and related companies, GlobeGas and Pol–Tex Methane, are involved in the exploration and production of methane gas in Europe. EuroGas, GlobeGas and Pol–Tex have been sued by either Kukui or Trustee Smith in three separate adversary proceedings. According to EuroGas, it, through its

subsidiary Energy Global, AG, acquired the stock of GlobeGas, B.V. in 1994 and 1995. GlobeGas is a Netherlands Corporation, formerly known as McKenzie Methane Poland, B.V., formerly owned by the McKenzies. Pol–Tex Methane, owned now by EuroGas, was owned prior to its transfer by the McKenzies, 85% by McKenzie Methane Poland Co. (MMPCO). MMPCO is owned by the McKenzie family. Pol–Tex Methane holds a concession to explore for methane gas in Poland, the concession is referred to as the Poland Project.

## IV.

## The Lawsuits

### (A) Kukui's state court case

Kukui, Inc. was formed by the Kamehameha Bishop Estate, an investor in MMC, to sue MMC, the McKenzies, and others for damages arising from MMC's development of coal bed methane gas wells in Alabama, New Mexico, and Colorado. Kukui asserted against each defendant one or more of the following claims: breach of contract, breach of the duty of good faith and fair dealing, fraud, fraudulent transfers, breach of fiduciary duties, violations of state security laws, sham to perpetuate a fraud, and alter ego. Kukui brought suit on March 30, 1992, in Fort Bend County, Texas, in Cause No. 77130, *Kukui, Inc. v. MMC, et al.* This case was still pending at the time of the MMC bankruptcy.

### (B) Kukui/MMC's adversary against EuroGas-related entities for transfers of monies

After confirmation of the MMC plan, Kukui, on behalf of MMC, in Adversary No. 95–

---

1. Although the Kukui Disclosure Statement in the MMC bankruptcy states "the Debtor, along with certain associated entities and individuals, conducted coal bed methane exploration, development, and/or operations in other countries, including Poland, India, and Columbia," there is no specific mention of MMC participating in any gas explorations, etc., other than domestic ones. The Trustee's Report dated April 19, 1995, recites no evidence of MMC assets related to the Poland Project other than avoidance actions against the other McKenzie affiliates.

2. Kukui became the designated representative of the bankruptcy estate of MMC, appointed under Sec. 1123(b)(3)(B) of the Bankruptcy Code and Sections 7.2(b) and (c) of the Liquidating Plan of Reorganization of Kukui for MMC and of the Unsecured Creditors' Trust established pursuant to Sec. 7.10 of the MMC plan. Kukui's duties to discover assets for the MMC estate are set out in: Section 7.2 of the MMC plan, as modified by the First Modification. Pertinent sections of the confirmed plan are included herein as an appendix.

4717, on October 30, 1995, sued the McKenzies individually as shareholders and directors of MMC for violations of the Texas Business Corporation Act, including unlawful distributions, actual and constructive fraud, and as alter ego of MMC. In addition, in the same case, Kukui sued numerous defendants, including the EuroGas related companies, McKenzie Methane Poland, B.V. ("MMPBV", now known as GlobeGas) and Pol–Tex Methane, for violations of the Texas Uniform Fraudulent Transfer Act and 11 U.S.C. § 548. Kukui sought recovery of $135,010.00 fraudulently transferred by MMC to Pol–Tex and $495,236.10 fraudulently transferred by MMC to MMPBV. (Ex. A1 to Trustee's Response. Docket Entry 56). Settlement of Kukui's allegations against Pol–Tex and GlobeGas is discussed *infra* at Section VII. This settlement forms the basis of the objections to the trustee's fees discussed herein.

#### (C) The Smith lawsuits related to the Poland Project

Smith has filed two adversaries against EuroGas-related entities and others. On February 28, 1997, Smith, in Adversary No. 97–4114, sued EuroGas, GlobeGas, and Pol–Tex to recover for the bankruptcy estates, title to the Poland Project, which asset Smith alleges the McKenzies valued at $180,000,-000. In addition, on March 25, 1997, Smith, in Adversary No. 97–4155, sued EuroGas, and others to recover the consideration paid, consisting of stock and cash, for the transfer of the Poland Project for which the bankruptcy estates allegedly were entitled to compensation but for which they received no value. EuroGas, GlobeGas, and Pol–Tex jointly moved for summary judgment in Adversary No. 97–4114, alleging that the trustee's claims are barred by the Kukui–GlobeGas Settlement Agreement.

#### (D) Discharge cases against the McKenzies

On January 29, 1996, Kukui filed Adversary No. 96–4064 objecting to Michael McKenzie's discharge. Subsequently, the trustee intervened in the adversary. After a five week trial, presided over by Judge Wheless, the Court barred Michael McKenzie's discharge finding, among other things, that MMC is the alter ego of Michael McKenzie.

On February 9, 1996, Kukui filed Adversary No. 96–4098, objecting to Timothy McKenzie's discharge. Again the trustee intervened. After trial, presided over by Judge Greendyke, the Court found that Timothy McKenzie's discharge should be granted.

On February 15, 1996, Kukui filed Adversary No. 96–4115, objecting to Steven McKenzie's discharge. Again, the trustee intervened. That case remains pending. The trustee has also objected to exemptions claimed by Timothy and Steven McKenzie.

### V.

### The Trustee's Financing

#### (A) The First Financing Order under 11 U.S.C. § 364

On May 3, 1996, the trustee moved to obtained credit from Kukui, Inc. of up to $150,000 in order to investigate the debtors and their transfers of assets. After hearing, on July 3, 1996, the Court granted the trustee's motion and granted Kukui, Inc. a super-priority administrative claim for its advance of credit. Under the financing agreement, the trustee provides to Kukui a budget in advance of receiving increments of financing. The financing is provided in $50,000 increments. Use of the financing by the trustee is further subject to proper application to the Court with notice to creditors and hearing, for payment of the particular administrative expense. Further, under the agreement, the trustee and Kukui agree to make available to each other any non-privileged information obtained concerning property of the estate or administration of the estate. The trustee received the last financing increment under the First Financing Order in November 1996. From November 1996 and January 1998, Kukui did not provide any financial support to the trustee. The trustee participated in the Michael McKenzie, Timothy McKenzie, and Steven McKenzie discharge actions without Kukui's financial support.

**(B) The Second Financing Order under 11 U.S.C. § 364**

On January 22, 1998, the trustee filed his second motion for postpetition financing. Under the second financing arrangement, Kukui agreed to advance an additional $1.2 million to the trustee in return for which Kukui would receive 75% of the net proceeds from the liquidation of any property and/or assets recovered by the trustee on behalf of the McKenzie estates (other than avoidance actions and derivative actions). The remaining 25% was agreed to be property of the estates. (EuroGas Ex.27).

Three objections were filed to this motion from the five debtors as a group, from Frances McKenzie, and from Sacks and Associates, former counsel for the McKenzies. Frances McKenzie objected to this motion on the grounds that providing financing to the trustee to pursue proceedings against the debtors was inappropriate because she cannot afford to spend $100,000 to $1,200,000 defending the trustee's adversary proceedings. She further contended that the existence of a fund to pay the trustee's fees alters the ability of the defendants to settle a case. Further, the arrangement elevates Kukui to an administrative claimant when it had been a general unsecured creditor. (The Court notes that only the amount loaned under the financing order becomes an administrative expense, not Kukui's pre-petition claim.) Sacks and Associates objected because the loan would allow the trustee to incur as many expenses in trustee fees and legal bills as he desired. The McKenzie debtors objected because the financing would ensure payment of fees for work which was duplicative of work already being done by Kukui at no cost to the estate. Further, according to the debtors, the trustee's judgment would be clouded in the exercise of his fiduciary duty to the other creditors. Further, the debtors contended that they held claims against Kukui which the trustee failed to investigate and instead sold to Kukui.

On April 1, 1998, this Court entered the second financing order authorizing the trustee to borrow funds from Kukui to continue the administration of the debtor's cases, including the payment of professional's fees related to prosecution of his adversary proceedings. As under the first financing order, the trustee has independence in the exercise of his discretion as a Chapter 7 trustee on behalf of his bankruptcy estates.

## VI.

### Objections to the Trustee's Fee Application

**(A) EuroGas' objections**

EuroGas objects to the third and fourth fee applications on the following grounds:

(a) The payment of the trustee's fees would be from the proceeds of the loan from Kukui approved in the second financing order and that loan breaches the Kukui–Globe-Gas Settlement Agreement;

(b) The loan from Kukui to the trustee breaches the Utah covenant of good faith and fair dealing;

(c) Both Kukui and the trustee have committed fraud in suing the EuroGas defendants despite the Kukui–GlobeGas Settlement Agreement;

(d) The trustee has intentionally interfered with the contractual relations involved in the Kukui–GlobeGas Settlement Agreement;

(e) The trustee is liable for wrongful conduct against EuroGas;

(f) The trustee's counsel has conflicts of interest which have not been adequately disclosed or addressed and which are inherent in the representation of the five bankruptcy estates;

(g) The trustee is foreclosed from proceeding against the EuroGas defendants by the finding of Judge Wheless in Adversary No. 96–4064 that MMC and Harven Michael McKenzie are alter egos;

(h) As a matter of public policy and equity, the trustee should be estopped from incurring fees to proceed against the EuroGas defendants because the trustee's interest are similar to those of Kukui which were the subject of the Kukui–GlobeGas Settlement Agreement.

Regarding Kukui, EuroGas also alleges that: (1) Kukui asserted the same claims as the trustee and even if Kukui's and the trustee's claims are separate and distinct, Kukui breached the Kukui–GlobeGas Settlement Agreement; (2) the trustee's claims are barred by the Kukui–GlobeGas Settlement Agreement; (3) Kukui substantially controls the activities of the trustee; (4) EuroGas has standing to assert a breach of the Kukui–GlobeGas Settlement Agreement; and (5) this Court should not attempt to adjudicate or determine the rights of EuroGas and Kukui with respect to the Kukui–GlobeGas Settlement Agreement.

### (B) Debtors' objections

The individual McKenzies object to the fee applications alleging that the services rendered by trustee's counsel did not benefit the estate and were duplicative of the efforts by counsel for Kukui. At the hearing on the fee application, debtors' counsel filed with the Court its brief changing their objection to that of a conflict of interest by both the trustee and his counsel based upon the allegations that: (i) the trustee and/or his counsel failed to disclose in the Application to Employ Counsel claims between the estates of Michael, Timothy, and Steven McKenzie, as well as McKenzie Energy U.S. (MEUS) and LaPlata Pipeline Company (LaPlata); (ii) the trustee represents the interests of Frances McKenzie via his status as trustee for Michael McKenzie who holds a power of attorney for Frances who is scheduled as a debtor to the estates of Timothy and Steven McKenzie; (iii) the trustee purports to represent and/or control additional affiliated non-debtor entities; (iv) the trustee represents both the plaintiff and the defendant in adversary proceeding nos. 97–4155 and 97–4114; (v) the trustee sold the estate's counterclaims, cross claims, and third party claims against Kukui to Kukui at less than arm's length transaction; and (vi) the trustee failed to pursue a preference claim against Kukui scheduled by LaPlata.

### (C) The trustee's position

As to the individual debtors' objections, the trustee responds: (a) that they have no standing to object to the trustee's fee application; (b) the joint administration of the estates of Michael, Timothy, and Steven McKenzie, as well as of the estates of MEUS and LaPlata, does not create a conflict of interest; (c) similarly, the joint administration of estates does not prejudice the estates' creditors; (d) the trustee does not purport to represent any interest of Frances McKenzie; (e) the trustee's participation in the pending adversaries is not inconsistent; (f) sale of the counterclaims/third-party claims to Kukui was properly noticed and approved by the bankruptcy court following a hearing; (g) the bankruptcy court resolved the LaPlata Pipeline issue prior to the appointment of the trustee, foreclosing any further pursuit by the trustee; (h) the second financing agreement approved by the Court is in the best interests of the estate; and (i) the trustee's actions and those of his counsel have been taken in good faith and have benefited the estates and should be compensated by the interim fee applications.

As to the EuroGas objections, the trustee responds: (1) Kukui–GlobeGas settlement was not intended by Kukui and EuroGas to include the trustee or any rights he had on behalf of the estates to assert in the Poland Project; (2) EuroGas has always dealt independently with the trustee and recognized that his interests are separate from those of Kukui; (3) the trustee is not foreclosed by any alter ego finding by the bankruptcy court from proceeding with the adversary proceedings.

### (D) Kukui's position

Kukui's position as to the EuroGas objections is: (1) Texas law governs the Kukui–GlobeGas Settlement Agreement, the effects of which must be considered by the Court in order to resolve the contentions that EuroGas has put at issue; (2) even if Utah law applies, a third party beneficiary may not bring a cause of action for breach of the duty of good faith and fair dealing; (3) Kukui as a creditor has standing to file complaints against the debtors, thus, any assistance rendered to the trustee in his complaints is appropriate and does not breach the settlement agreement; (4) Kukui did not bring

and cannot control, directly or indirectly, the actions of the trustee against the EuroGas defendants; (5) if Kukui's release constituted a release of the trustee's claims to the Poland Project, then the Kukui–GlobeGas Settlement Agreement is void or unenforceable, or avoidable under 11 U.S.C. § 549; and (6) EuroGas lacks standing to assert a breach of the Kukui–GlobeGas Settlement Agreement because it was not a party to that agreement. Kukui takes no position regarding the debtors' objections.

Because any one of the contentions at issue directly impacts the findings of this Court regarding the fee application, this Court conducted an evidentiary hearing during which EuroGas, the trustee, Kukui, and the individual McKenzies were allowed a full and fair opportunity to litigate all related matters necessary to decide the grounds for the objections. Even though EuroGas urges that this Court should limit its ruling, EuroGas has challenged all transactions between Kukui, the trustee, and the EuroGas defendants.

## VII.

### The Kukui–GlobeGas Settlement Agreement

In the fall of 1995, EuroGas began negotiating with Texaco, Ltd., seeking agreement for Texaco to develop and purchase part of the Poland Project. At approximately the same time, and prior to the bankruptcy filings of the individual McKenzies, on October 30, 1995, Kukui, on behalf of MMC, filed Adversary No. 95–4717, the fraudulent transfer case against Pol–Tex and MMPBV to recover funds paid to them by MMC.

Texaco learned about the Kukui suit against the EuroGas subsidiaries in early summer 1996 and advised EuroGas and Howard Landa, counsel for EuroGas, to get a release related to the McKenzie bankruptcy issues as a condition to Texaco's contracting with EuroGas. Thereafter, Landa began corresponding with Richard Tate, counsel for Kukui, and Trustee Smith, concerning the EuroGas sale of the Poland Project to Texaco and Texaco's concern as to any constructive trust claims against the property to be sold. At this time, no one had asserted a constructive trust claim against or an alter ego theory involving the Poland Project.

In August 1996, Landa requested a meeting in Houston with the trustee and counsel for Kukui, Lee Henkel, and Richard Tate to discuss the settlement of any claims asserted or which could be asserted against the Poland Project. On August 28, 1996, Landa, Tate, Henkel, Ben Floyd, the trustee's counsel, and the trustee met at the offices of trustee's counsel.

At the Houston meeting, the trustee explained that his bankruptcy estates owned 50%–100% of the stock in MMPCO and he required further information about the chain of transactions transferring to the EuroGas entities the Poland Project from Pol–Tex (85% of the shares of which company were owned by MMPCO). Landa supplied some information regarding the chain of title related to the Poland Project but explained little about the consideration going to the McKenzies. Consequently, the trustee told Landa that he could not consider settlement of the estates' or MMPCO's claims against the Poland Project without more information. After the trustee took that position, Landa excused Mr. Floyd and the trustee from the meeting and continued to pursue settlement with Kukui at the office of the trustee.

Over the next few months, throughout Kukui's meetings and negotiations with Landa, Kukui and its counsel made it clear to EuroGas and its counsel that the trustee, not Kukui, held the claim to and through MMPCO for any fraudulent transfer or constructive trust claim concerning the Poland Project. Landa disregarded these statements and pursued settlement with Kukui, since he thought Texaco was only interested in a settlement and release by Kukui. Consequently, Kukui dismissed MMPBV and Pol–Tex Methane from its fraudulent transfer adversary proceeding on October 27, 1996 and entered into a settlement agreement dated November 8 and 12, 1996, with the MMC Unsecured Creditors' Trust, GlobeGas, Pol–Tex Methane, B.V., McKenzie Methane Rybnik, and McKenzie Methane Jastrzebie (the "Kukui–GlobeGas Settlement Agreement"). Landa, counsel for EuroGas, drafted the pro-

visions regarding what parties were included in the settlement and the language of Kukui's release. Landa signed the Kukui–GlobeGas Settlement Agreement on November 8, 1996, on behalf of GlobeGas, B.V., Pol–Tex Methane, SP. Z.O.O., McKenzie Methane Rybnik, and McKenzie Methane Jastrzebie.

Under the settlement, Kukui released any claims that it might have against GlobeGas with respect to the Poland gas concession. The settlement agreement recites that Kukui has asserted claims against GlobeGas with respect to concessions it holds for the exploration of oil and gas reserves in Poland and that Texaco, Inc. Ltd., requested a release of any claims before proceeding with further development of the concession. By separate understanding, EuroGas, in return for the dismissal, agreed on behalf of its subsidiaries, that if the matter were not resolved, Kukui could file a new action against those defendants and they would not assert any statute of limitations defenses.

The Kukui–GlobeGas Settlement Agreement states in pertinent part:

RECITALS

. . . . .

3. Pursuant to its rights under the Plan, Kukui and the Unsecured Creditors' Trust have asserted certain claims against GlobeGas with respect to concessions it holds for the exploitation of oil and gas reserves in Poland. GlobeGas is currently negotiating a transaction with Texaco, Inc. to further develop the concessions. Texaco has requested that it receive a release from Kukui or the Unsecured Creditors' Trust of any claims as a precaution before proceeding with further development. Therefore the parties have reached an agreement to settle any claims which KUKUI or the Unsecured Creditors' Trust may have against GlobeGas.

STIPULATION

A. In satisfaction of any and all claims which KUKUI or the Unsecured Creditors' Trust may have against GlobeGas, GlobeGas agrees to assign and deliver (or cause to be issued), in the aggregate, 100,-000 shares of restricted common stock of its parent company, EuroGas, Inc. to KU-KUI and an option to purchase up to 2,000,000 shares of restricted common stock of its parent company, EuroGas to the Trustees of the Estate of Bernice Pauahi Bishop and register the shares, including option shares, pursuant to a registration rights agreement, a copy of which is attached hereto as Ex. "A".

B. In consideration of the agreements contained herein, Kukui and the Unsecured Creditors' Trust hereby release and forever discharge GlobeGas and any major oil and gas concern with whom GlobeGas may contract with respect to certain concessions for the exploration and exploitation of methane gas in Poland, including but not limited to Texaco, Inc. as well as their respective successors, assigns, agents, attorneys, servants, employees, affiliates, and subsidiaries from all claims, demands, and actions, or causes of action, or damages, losses, costs, attorneys' fees, expenses, and other compensation.

In addition, the Registration Rights Agreement between Kukui and EuroGas states in part:

Section 14. *Governing Laws.* This Agreement shall be governed by and construed in accordance with the laws of the State of Utah, (without regard to any conflicts of law principles that would require the application of the laws of any other jurisdiction).

Section 15. of the Registration Rights Agreement between Kukui and EuroGas states:

Section 15. *Rights Cumulative.* The rights of the parties under this Agreement are cumulative and shall not preclude the assertion by any party of any rights now or hereafter available to it under any other agreement, by law or otherwise.

*Id.,* Appendix A—Registration Rights Agreement at p. 10.

The Registration Rights Agreement was signed on December 3, 1996, by someone in EuroGas' legal counsel's office signing the name of Hank Blankenstein, then Corporate Secretary of EuroGas, Inc. Blankenstein testified that his signature was authorized. In exchange for the release, Kukui received 100,000 shares of EuroGas stock and Kukui's

parent, the Kamehameha Schools Bishop Estate ("KSBE") received an option to acquire two million shares of EuroGas stock at certain prices. Under the Registration Rights Agreement, EuroGas agreed to file a registration statement that would cover Kukui's 100,000 shares and the option of KSBE no later than December 31, 1996 (the "Registration Agreement"). EuroGas did not file such registration statement by December 31, 1996, as it had agreed. The Kukui–GlobeGas Settlement Agreement was not noticed to creditors of MMC or of any of the five estates represented by the trustee and was not approved by any court.

Trustee Smith was not a party to the Kukui–GlobeGas settlement. The agreement by its terms binds only Kukui and the MMC Unsecured Creditors' Trust. Further, under the MMC confirmed plan, the individual McKenzies, of whose bankruptcy estates Smith is Chapter 7 trustee, were divested of any equity interest in MMC.[3] The settlement agreement has no choice of law provision. MMPCO was neither a party, nor a signatory to the Kukui–GlobeGas Settlement Agreement. None of the recitals in the Kukui–GlobeGas Settlement Agreement deal with MMPCO. Rather, the recitals all relate to the MMC bankruptcy estate, which is itself through Kukui, a creditor in the Chapter 7 estates represented by the trustee. EuroGas was neither a party, nor a signatory to the Kukui–GlobeGas Settlement Agreement. However, Kukui knew at the time of the contract that EuroGas was an intended beneficiary of the contract.

The settlement agreement is silent regarding the trustee and any claims of his estates. The parties failed to define what claims are asserted by "Kukui and the Unsecured Creditors' Trust against GlobeGas with respect to concessions it holds for the exploitation of oil and gas reserves in Poland." The parties fail to state that the trustee or any of the bankruptcy estates that he represents are Kukui's or the MMC Unsecured Creditors Committee's "successors, assigns, agents, attorneys, servants, employees, affiliates, and subsidiaries ..." EuroGas offers no evidence that the trustee has any of those relationships to Kukui at the time of the settlement. The trustee was not copied on correspondence relating to the settlement between Kukui and Euro-Gas. A confidentiality agreement prevented disclosure. Kukui requested permission from Landa that the trustee be told the settlement terms, but he refused. Pursuant to the confidentiality agreement, Kukui complied with EuroGas' demand that the trustee be kept ignorant of the settlement. The trustee did not learn about the terms of the settlement until approximately one year later when the agreement was disclosed during the Harven Michael McKenzie discharge trial.

At the time of the Kukui–GlobeGas Settlement Agreement, the trustee had already received Court approval for financing from Kukui to administer the estate and the settlement agreement does not prohibit Kukui from loaning money again in the future to the trustee. Nothing in the Kukui–GlobeGas Settlement Agreement prohibits Kukui from benefiting along with any other creditor from any recovery by the trustee of assets on behalf of the unsecured creditors of the trustee's bankruptcy estates. In fact, Section 15 of the Registration Rights Agreement specifically preserves for the parties, Kukui and EuroGas, any rights that they had from any other source. In Section 15, the rights of each party are recognized as cumulative, not exclusive, "and shall not preclude the assertion by any party of any rights now or hereafter available to it under any other agreement, by law or otherwise." This Court finds Kukui's rights as a creditor in the trustee's five bankruptcy cases are derived from other agreements and by law.[4]

---

**3.** The MMC plan provides at § 6.13:

> Class 5—Common Stock Interests.
> As of the Effective Date, all Common Stock Interests shall be deemed canceled and extinguished, and no holder of an Allowed Common Stock Interest shall receive or retain under the Plan on account of such Interest any property.

The Disclosure Statement states that MMC is "a privately held corporation, and its stock is held by Harven Michael McKenzie, his wife, Frances McKenzie, and their sons, Timothy and Steven McKenzie, each of whom own 25% of the common stock of the Debtor."

**4.** The Court notes that EuroGas could have included an indemnity clause in the Kukui–Globe-

In August 1997, Kukui filed suit against EuroGas in the Texas District Court for breach of the Registration Agreement and for specific performance (the "District Suit"). The district suit was removed to the Utah District Court.

## VIII.

### The Trustee EuroGas Settlement

After the execution of the Kukui–GlobeGas Settlement Agreement in November and December 1996, Landa, on behalf of EuroGas, continued his negotiations with the trustee for a settlement of the trustee's claims. On February 12, 1997, the trustee met with Landa and was informed by him of EuroGas' position as transfer agent for the 1995 preferred shares of EuroGas stock (convertible two for one into common shares) issued to Rolf Schlegel, MCK Development, B.V., Claron, N.V. and Okibi, N.V. and of applicable Utah law concerning a legal method to freeze the stock's conversion or transfer through court proceedings or the issuance of a bond. The trustee conferred with Kukui and attempted to obtain placement of a bond. Kukui refused to underwrite such a bond.

The trustee filed Adversary No. 97–4114 on February 28, 1997, against MMPCO, EuroGas, Inc., GlobeGas, B.V., and Pol–Tex Methane, SP. Z.O.O. to protect the estates in the event of EuroGas' sale, through Pol–Tex, of the Poland Project to Texaco. The trustee alleged that his bankruptcy estates have rights to the Poland Project through ownership of stock in MMPCO and because MMPCO is the alter ego of Michael McKenzie. Thus, the bankruptcy estates were entitled to recover title to the Poland Project which had been transferred by the McKenzies for no consideration.

The trustee and EuroGas entered into a settlement agreement on March 6, 1997, which was noticed to parties in interest in all five bankruptcy cases, and on July 25, 1997, the Court entered its order approving compromise and settlement agreement (the

"Trustee EuroGas Settlement Agreement"). By this agreement, the trustee waived any claim against Texaco or the property sold by EuroGas to Texaco, but the trustee retained his rights alleged in Adversary No. 97–4114 to look to the consideration paid by Texaco and reserved the right to maintain his claims against EuroGas and others. Among other provisions, EuroGas agreed to use its best efforts to recover and cooperate with the trustee's efforts to recover the common stock of EuroGas held by one or more of the stockholders. Kukui Ex. 19, tab 52, Paragraph 6, Trustee EuroGas Settlement Agreement. Kukui was not a party to the Trustee EuroGas Settlement Agreement.

At no time prior to its execution of the Trustee EuroGas Settlement Agreement did EuroGas allege that the release by Kukui barred the trustee's suit or prevented or made unnecessary by the Trustee EuroGas settlement or that if the trustee pursued EuroGas, it would be a breach of the Kukui–GlobeGas Settlement Agreement. In fact, Howard Landa cooperated with the trustee in an attempt to aid the trustee in preserving the proceeds of the Poland Project for the bankruptcy estates. After entering into the Trustee EuroGas Settlement Agreement, and in accordance with Landa's advice concerning Utah law, on March 25, 1997, the trustee filed Adversary Proceeding No. 97–4155 to prevent EuroGas' transfer or conversion of its preferred stock to the alleged fraudulent transferees of the Poland Project.

Kukui is not a party to Adversary Nos. 97–4114 or 97–4155, but after April 17, 1997, Kukui and the trustee remained co-plaintiffs in the discharge actions. Kukui recommended to the trustee that he make EuroGas a nominal party in Adversary Nos. 97–4114 and 97–4155. Maintaining his independence in this regard, the trustee refused to do so.

At the hearing on the fee applications, the trustee, his counsel, Ben Floyd, Richard Tate, and Lee Henkel, counsel for Kukui, testified about the intent of the parties to the Kukui–GlobeGas and Trustee EuroGas set-

Gas Settlement Agreement in favor of EuroGas or its subsidiaries against the claims of any persons claiming by, through, or under Kukui. This Court notes that ordinarily parties intending cer-

tain results by their agreements include such clauses to guard against failure or default by one of the parties that results in expenses to the other contracting party.

tlements. No objection was made by Euro-Gas that such testimony violated the Utah parol evidence rule. Numerous exhibits involving the correspondence with Howard Landa, on behalf of EuroGas, were introduced. The Court finds the testimony of the trustee, Ben Floyd, Richard Tate, and Lee Henkel to be credible.

No one with knowledge about the Kukui–GlobeGas or Trustee EuroGas settlements testified for EuroGas, Inc. Howard Landa did not testify. Instead, Hank Blankenstein, Director, Vice President, and Chief Financial Officer for EuroGas, Inc., who was not involved in any negotiations regarding these agreements, but whose name was signed to the Registration Rights Agreement on behalf of EuroGas, testified simply that EuroGas thought that the Kukui–GlobeGas Settlement Agreement would resolve "the issue that Texaco had with the bankruptcy claims that they had against Pol–Tex and MMR and MMJ and would release them from any further actions under those bankruptcy proceedings," Kukui Ex. 31B at 25, and that EuroGas was "totally amazed" when sued by Trustee Smith. The Court finds that Mr. Blankenstein knew nothing factually about the matters at issue in this case.

This Court finds: (1) that EuroGas always knew that the trustee and Kukui represent separate legal interests; (2) that EuroGas always dealt with the trustee as a separate legal entity from Kukui; and (3) that Euro-Gas never intended to settle the claims of the trustee's bankruptcy estates to the Poland Project in the Kukui–GlobeGas settlement.

## IX.

### Resolution of the EuroGas Objections

#### (A) Alter Ego

■ Although the trustee bears the burden to justify the fee applications, the Euro-Gas defendants bear the burden to prove collateral estoppel bars the trustee's complaints. *Greenberg v. Board of Governors of the Federal Reserve System*, 968 F.2d 164, 169 (2d Cir.1992); *American Fed. of Gov't Employees, Council 214, AFL—CIO v. Federal Labor Relations Authority*, 835 F.2d 1458, 1463 (D.C.Cir.1987); *United States v.*

*Brackett*, 113 F.3d 1396 (5th Cir.1997); *Exhibitors Poster Exchange v. National Screen Service Corp.*, 421 F.2d 1313, 1316 (5th Cir. 1970).

Following a trial, Judge Wheless in Adversary No. 96–4064, *Kukui v. Harven Michael McKenzie*, held that the debtor used MMC as a sham to perpetuate a fraud. The corporate existence of MMC should be disregarded for the purpose of that section 727(a)(3) action. In addition, Judge Wheless concluded that Michael McKenzie's alleged transfer of his 25% interest in MMPCO to Frances McKenzie separate property was a sham transaction, that Michael McKenzie did not sell his interest to his wife, Frances, and that he and his family still own an interest in the Polish concession and/or the proceeds of the sale of some or all of it. This finding of alter ego between Harven Michael McKenzie and MMC was not made until approximately one year after the execution of the Kukui–Globe-Gas Settlement Agreement. There has been no finding of any alter ego relationship between Michael McKenzie and MMPCO. There has been no finding of any alter ego relationship between MMC and MMPCO.

EuroGas urges that Judge Wheless' finding, in Adversary No. 96–4064, that MMC and Michael McKenzie were alter egos, combined with the Kukui–GlobeGas settlement released any claims held by Michael's bankruptcy estate against EuroGas and its subsidiaries concerning the Poland Project. The Court finds that EuroGas' argument overlooks the trustee's rights as representative of the estates of Steven and Timothy McKenzie, each of whom as stockholders of MMPCO, hold independent claims against EuroGas for the transfer of the Poland Project. This aspect alone defeats EuroGas' contention.

■ Moreover, at the time of entering into the Kukui–GlobeGas Settlement Agreement, EuroGas excluded the bankruptcy trustee from the settlement negotiations even though once the individual debtor cases were filed, the bankruptcy trustee became the owner of any alter ego claims that could be pursued on behalf of the bankruptcy estates. Fifth Circuit law provides that the bankruptcy trustee holds the initial right to

pursue allegations of alter ego on behalf of the bankruptcy estate. *Gibraltar Savings v. LDBrinkman Corp.,* 860 F.2d 1275, 1284–1285 (5th Cir.1988); *S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc.,* 817 F.2d 1142 (5th Cir.1987); *In re MortgageAmerica,* 714 F.2d 1266 (5th Cir.1983). As a result, from the date of Smith's appointment in these bankruptcy cases, he held the exclusive right to assert on behalf of the McKenzie debtors any rights accruing to these estates by virtue of their alleged alter ego status with other McKenzie entities. Only trustee may pursue an action on behalf of Michael McKenzie as alleged alter ego of MMPCO to set aside any voidable transfer of its asset, the Poland Project. Consequently, under Fifth Circuit law, once the individual McKenzie bankruptcy cases had been filed, Kukui and postconfirmation MMC, in their status as creditors of the individual McKenzie estates, could not, without the trustee's and this Court's approval and participation, assert, much less compromise on behalf of the individual estates, any claim such as that involving the Poland Project, against EuroGas arising through MMPCO as alter ego of the individual McKenzies. *See* Fed.R.Bankr.P. 9019; *Protective Committee for the Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). Kukui could settle its own interests but none related to allegations of alter ego arising out of McKenzie activities.

█ EuroGas alleges that the interests of the trustee and Kukui are so close as to necessitate treating them identically and holding the trustee bound by the Kukui–GlobeGas Settlement Agreement. Such a result would be inequitable where EuroGas purposefully excluded the trustee from the Kukui–GlobeGas Settlement Agreement, despite its knowledge that not only was the trustee a necessary party but the only party that could settle claims against the Poland Project.

█ EuroGas contends, nevertheless, that the independent claims held by the estates of MMC and Michael McKenzie to set aside or to seek damages for fraudulent transfers, including the transfer of the Po-

land Project, became merged into one cause of action by virtue of the finding that MMC is the alter ego of Michael McKenzie. The Court acknowledges the single entity theory as stated in *Shamrock Oil and Gas Co. v. J.E. Ethridge,* 159 F.Supp. 693, 696 (D.Colo. 1958):

> The effect of applying the alter ego doctrine, of course, is that the corporation and the person who dominates it are treated as one person, so that any act committed by one is attributed to both, and if either is bound, by contract, judgment, or otherwise, both are equally bound. It should be noted, however, that this is done only for the purpose of adjudging the rights and liabilities of the parties in the case. See 1 Fletcher, Cyc. Corp. (Perm.Ed.) 136–137.

█ The alter ego doctrine is a remedy, the purpose of which is to increase the assets against which a creditor of the subordinate entity may satisfy its claim. *See Kern v. Gleason,* 840 S.W.2d 730, 736 (Tex.App.— Amarillo 1992, no writ) ("The piercing of the corporate veil is not a separate cause of action but a means of imposing liability where it would not otherwise exist. The various doctrines for disregarding the corporate entity are only remedial, for they only expand the potential sources of recovery.") In bankruptcy, assets attached through use of the alter ego doctrine are used to maximize the value of the bankruptcy estate. *See Board of Directors on Chestnut Grove Condominium Unit Owners' Ass'n v. Resolution Trust Corp.,* 161 B.R. 860, 863 (D.D.C.1993). Concomitantly, all liabilities of the subordinate entity become liabilities of the dominate entity so that the legitimate creditors of the two entities share equally in the available assets. Thus, in finding that MMC is the alter ego of Michael McKenzie, the assets of each entity became available for payment of the debts of both entities.

MMC's claim against EuroGas and others to set aside voidable transfers from MMC is an asset of the MMC bankruptcy estate. Likewise, MMPCO's claim against EuroGas to set aside voidable transfers is an asset of the bankruptcy estate of Michael McKenzie through his stock ownership of MMPCO. Thus, two independent claims against Euro-

Gas were created through EuroGas' alleged participation in wrong doing as a recipient of fraudulent transfers. The collapsing of the bankruptcy assets and liabilities of MMC and Michael McKenzie into one entity does not serve to merge the two separate assets of the estates into one asset. To the contrary, use of the alter ego doctrine enlarges the pool of assets available to legitimate creditors.

EuroGas contends, nevertheless, that Kukui's settlement of MMC's claim effectively settled the claims on behalf of the Michael McKenzie estate. Under the confirmed MMC plan, however, Kukui had authority to act only on behalf of MMC. Indeed, the Kukui–GlobeGas Settlement Agreement itself explicitly binds only Kukui and the others named therein. *C.f. Air–Sea Forwarders, Inc. v. United States,* 39 Fed.Cl. 434 (Fed.Cl.1997) (release stating, "The releases in this Agreement shall extend to and inure to the benefit of each released party and each of their past and present . . . alter egos . . ." held to release CIA as alter ego of named settling party even though CIA not a named party to release.) Kukui did not purport to settle any claim existing on behalf of the Michael McKenzie estate, and it lacked authority to do so, as the bankruptcy trustee holds the authority to act on behalf of his estates. Satisfaction and release by the subordinate entity, MMC, might bind the dominate entity, Michael McKenzie, if only one cause of action existed, but in this instance rights accrued in favor of MMC and Michael McKenzie's estates independently.

Moreover, the contract established by the settlement agreement between Kukui and GlobeGas was not entered into by the alter ego of Michael McKenzie and thus, cannot be said to have been the act of Michael McKenzie. The entity which Judge Wheless found to be the alter ego of Michael McKenzie is the preconfirmation MMC which was under the domination and control of Michael McKenzie for whose financial gain the corporate form was abused. Upon confirmation of the plan of reorganization that MMC ceased to exist, its preconfirmation shareholders were divested of any interest, and its creditors, led by Kukui, were placed in charge. It is the Kukui dominated MMC which executed and is bound by the Kukui–GlobeGas Settlement Agreement. Had settlement of all fraudulent transfer claims occurred while MMC was dominated by Michael McKenzie, then EuroGas would have a strong argument that the dominant individual, Michael, and consequently, his bankruptcy estate, was also bound by the agreement. Reported cases involving alter ego relationships bind the dominate entity to the contracts entered into by that entity in the name of its alter ego, the subordinate entity during the time that the alter ego relationship exists. Once the dominate entity has been ousted and control over the subordinate replaced by its creditors, the subordinate entity is no longer the alter ego of the previously dominate entity because that entity is no longer in control.

As to whether the claim settled by Kukui was the same claim that exists in favor of Michael McKenzie's estate the Court concludes that it is not. The claim in favor of Michael McKenzie arises through ownership of MMPCO stock. MMPCO holds the right to set aside the fraudulent transfer of its asset, the Poland Project. Whatever claims were released by Kukui on behalf of MMC did not arise through MMPCO because MMC never held any stock interest in MMPCO nor has there been any holding that those entities had an alter ego relationship. Thus, the Kukui–GlobeGas Settlement Agreement releases only those explicitly named.

### (B) Estoppel by contract

EuroGas contends that fees should not be approved for the trustee because Kukui's actions in funding the trustee and Smith's actions in suing EuroGas breach the Kukui–GlobeGas Settlement Agreement and are in fraud of EuroGas. EuroGas urges the application of Utah law to resolve whether the Kukui–GlobeGas Settlement Agreement has been breached. The settlement agreement between Kukui and the EuroGas subsidiaries itself contains no choice of law provision. However, the Registration Rights Agreement between Kukui and EuroGas involving the stock that was given to Kukui as consideration in the settlement provides for the application of Utah law. EuroGas argues that the

two agreements should be read together and the choice of law provision argues in the Registration Rights Agreement should be engrafted upon the settlement agreement.

Kukui disagrees, urging that Texas law governs the settlement agreement. According to Kukui, Texas law applies because the "most significant relationships" were in Texas. *Rocky Mountain Helicopters v. Bell Helicopter*, 24 F.3d 125, 129 (10th Cir.1994). Kukui notes that: (1) the settlement agreement is an agreement between a Texas corporation, three Polish joint ventures, and a Dutch, B.V. (no individual or corporation domiciled in Utah is a party to the agreement); (2) the settlement agreement was signed one month prior to, and not contemporaneous with the December 3, 1996 Registration Rights Agreement; (3) it settles claims in Adversary No. 95–4717 brought in the United States Bankruptcy Court for the Southern District of Texas, in which Kukui, a Texas corporation representing the Unsecured Creditors' Trust of McKenzie Methane Corporation, another Texas corporation, is the plaintiff and, the released parties, Pol–Tex Methane, a Polish limited liability company, and McKenzie Methane Poland, B.V., a Dutch corporation which is the predecessor to GlobeGas, B.V., are defendants; (4) the adversary proceeding was filed in and grew out of bankruptcy case No. 94–42758, also pending in the bankruptcy court for the Southern District of Texas; and (5) the settlement agreement was negotiated in Texas and Hawaii and its only connections with Utah are that it was drafted in Utah by counsel to Pol–Tex Methane and GlobeGas, who also serves as counsel to EuroGas, and that the stock of a Utah corporation is given as consideration for the release of claims in the Texas litigation.

This Court concludes that as between Kukui and EuroGas, the Registration Rights Agreement, although an addendum to the settlement agreement and not specifically incorporated by reference, is so integral to the actual performance of the contract that it cannot be severed. One implements the other. The settlement agreement incorporates the Registration Rights Agreement and is not a complete agreement without it. Consequently, this Court finds that the choice of law provision in the Registration Rights Agreement establishes that Utah contract law applies to interpretations of the Kukui–GlobeGas Settlement Agreement between those parties.

Regardless of whether one applies Texas or Utah law, the outcome is the same. There appears to be little difference in the basic law of contract or as to the law of common law fraud between Texas and Utah. Applying either state's law, at issue is what is the agreement of the parties? Did the EuroGas and Kukui intend to resolve the trustee's interests? Did EuroGas contract for Kukui's release of any claims that Trustee Smith had to the Poland Project? Does the Second Financing Agreement violate the letter and spirit of the Kukui–GlobeGas Agreement? Only if Kukui and EuroGas originally intended to contract to release the trustee's claims, is there a breach of contract or a possible fraudulent transaction when Kukui finances the further investigations by the trustee and the trustee sues the EuroGas defendants. Only, if by that agreement the parties intended to eliminate Kukui's support of the trustee in the proper exercise of his duties, does the trustee's suits against EuroGas and its subsidiaries violate the law. The contract is silent on those issues.

### 1. Contract law of Utah and Texas

The law of Utah is clear that "Releases are contractual provisions and should be interpreted according to well-developed rules of contract interpretation ... a court may consider extrinsic evidence if the meaning of the contract is ambiguous or uncertain." *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 267 (Utah 1995). The language of the Kukui–GlobeGas Settlement Agreement is ambiguous or uncertain as to what claims is Kukui actually releasing. Kukui releases "any and all" claims it has but those claims are nowhere defined. Since there is an ambiguity regarding what claims were released by Kukui, there is an ambiguity regarding the parties' intent to release any interest of the trustee. This Court finds that the parole evidence rule under Utah law directs a trial court to consider extrinsic

evidence as to what claims were in fact released by Kukui, what claims Kukui represented were released, and whether the parties intended to release any interests of the trustee.[5]

 All evidence admitted at the hearing before this Court shows that Kukui never claimed to EuroGas that MMC or Kukui had any interest in the Poland Project. Kukui never claimed to release any claims Trustee Smith held on behalf of his bankruptcy estates. Kukui only represented that it had claims for monies transferred wrongfully by the McKenzies, some of which went to Globe-Gas, MMPCO, and Pol–Tex Methane.

By a preponderance of the evidence, this Court finds that throughout their negotiations EuroGas always understood that Kukui made no claims to the Poland Project. In the Houston meeting held in August 1996 and in the September 1996 meeting held in Hawaii, Howard Landa, counsel for EuroGas, was told that only the trustee, not Kukui, held stock in MMPCO, and that only the trustee could assert claims against the McKenzie entities involved in the Poland Project. Landa's verbatim response, according to witnesses was, "I do not give a damn."

In addition, at the hearing before this Court, Hank Blankenstein, then Corporate Secretary of EuroGas, testified as follows when asked by EuroGas' counsel:

Q Okay. What was yours and EuroGas's understanding of what it was accomplishing with these two documents?

A It would resolve the issue that Texaco had with the bankruptcy claims that they had against Pol–Tex and MMR and MMJ and would release them from any further actions under those bankruptcy proceedings.

Kukui Ex. 31 B at p. 25.

In other words, if Texaco was satisfied, then EuroGas was satisfied. Consequently, the reason Landa disregarded the trustee's interests was that Texaco only required a Kukui release to close the Texaco EuroGas sale of the Poland Project. But for the pressure from Texaco, EuroGas, as counseled by Landa, had no intention of settling any challenge, Kukui's or the trustee's, to EuroGas' rights in the Poland Project. Access to Texaco's resources was critical to allow the young company to continue development of the Poland gas concession. Kukui was the only plaintiff with a case filed against a EuroGas-related entity at the time of the pending sale of the Poland Project. Texaco put no pressure on EuroGas to settle the interests of any parties other than Kukui. There is no evidence that Howard Landa ever told Texaco that the trustee claimed an interest in the Poland Project due to ownership of MMPCO stock. There is no evidence that Landa ever told his client that the trustee was a claimant to the Poland Project prior to the time that the trustee sued EuroGas in Adversary Nos. 97–4114 and 97–4155. There is evidence and this Court finds that Landa intentionally misled Texaco into believing that, apart from Kukui, no other claims existed against Michael McKenzie or MMPCO. Kukui Ex. 42.

EuroGas urges that Kukui refused to waive any rights on behalf of MMC to the Poland Project. However, from reviewing the exhibits of the correspondence, it is clear that Kukui refused to settle any matters with EuroGas piecemeal or without consideration. Unless EuroGas settled Adversary No. 95–4717, Kukui would waive nothing. That is very different from any suggestion that Kukui claimed an interest on behalf of MMC in the Poland Project.

Further evidence of lack of intent by EuroGas and Landa to acquire a release of the trustee's interests is the settlement between the trustee and EuroGas. After the trustee sued EuroGas and Pol–Tex, to protect the interests of his estates in the Poland Project, in Adversary No. 97–4114, a settlement was reached between the trustee and EuroGas on behalf of its subsidiaries, allowing the sale to Texaco to proceed but freezing the stock at

---

**5.** *South Falls Corp. v. Kalkstein,* 349 F.2d 378, 387–388 (5th Cir.1965) ("without doubt parole evidence is admissible in Texas to clarify a latent ambiguity."); *Donahue v. Bowles, Troy, Donahue, Johnson, Inc.,* 949 S.W.2d 746, 753 (Tex.App.—Dallas 1997, writ denied) ("A latent ambiguity exists when a contract is unambiguous on its face, but fails by reason of some collateral matter when it is applied to the subject with which it deals.") (citations omitted).

issue. As a result of the settlement, the trustee allowed the sale to proceed but reserved any rights to continue claims against EuroGas and its subsidiaries on behalf of his bankruptcy estates. At no time did EuroGas assert that the relief sought by the trustee in Adversary No. 97–4114 was barred by Kukui's release of its claims in the Kukui–GlobeGas settlement until after the Wheless judgment was entered against Michael McKenzie in Adversary No. 97–4064.

## 2. The law of common law fraud in Utah and Texas

■■■■■ Applying Utah law of fraud in *Cheever v. Schramm*, 577 P.2d 951, 954 (Utah 1978), the Utah Supreme Court found that:

... one claiming fraud must establish by clear and convincing evidence all of the following: 1) that a representation was made; 2) concerning a presently existing material fact; 3) which was false; 4) which the one making the misrepresentation either a) knew to be false, or b) made recklessly knowing he had insufficient knowledge upon which to base such representation; 5) for the purpose of inducing the other party to act upon it; 6) that the other party acting reasonably and in ignorance of its falsity; 7) did in fact rely upon it; 8) and was thereby induced to act; 9) to its injury and damage.

Similarly, Texas law provides, "the elements of fraud are a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282–283 (Tex.1994).

■■■■ This Court finds that there is no evidence that any representatives of Kukui prior to, during, or after its negotiations and settlement with the EuroGas defendants related to Adversary No. 95–4717 represented to EuroGas that it had the power to settle any claims of the trustee to the Poland Project. This Court finds that no such representations were made. Instead, this Court finds

that counsel for EuroGas failed to investigate the ownership of any legal claims against the Poland Project and disregarded all evidence presented to him that the only representative of a bankruptcy estate claiming any property right or interest in the Poland Project was Trustee Smith. This Court finds that no fraud was committed by Kukui,[6] or the trustee.

## 3. The duty of good faith and fair dealing under Utah law

■■■■ This Court is obligated to review the EuroGas allegations that the fees of the trustee should be denied because Kukui's providing the second financing to the trustee violates the spirit and intent of the Kukui–GlobeGas settlement and, specifically, that it violated the Utah common law of the covenant of good faith and fair dealing. As noted by the Utah Supreme Court in *St. Benedict's Development Co. v. St. Benedict's Hospital*, 811 P.2d 194, 199–200 (Utah 1991):

In this state, a covenant of good faith and fair dealing inheres in most, if not all, contractual relationships.... For commercial contracts, a covenant of good faith is statutorily imposed. Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract. A violation of the covenant gives rise to a claim for breach of contract.

An examination of express contract terms alone is insufficient to determine whether there has been a breach of the implied covenant of good faith and fair dealing. To comply with his obligation to perform a contract in good faith, a party's actions must be consistent with the agreed common purpose and the justified expectations of the other party. The purpose, intentions, and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties.

811 P.2d at 199–200 (citations omitted).

■■■■ In the Kukui–GlobeGas settlement, the agreed common purpose of Kukui and

---

6. This Court is concerned that counsel for Euro-Gas has proceeded to represent EuroGas in this matter despite a serious, actual conflict of interest.

EuroGas was to satisfy the demands of Texaco that Kukui and the MMC Unsecured Creditors' Trust release any and all of the asserted rights of MMC in the Poland Project. Kukui settled on behalf of MMC all claims it had to the Poland Project which consisted of claims to monies transferred to EuroGas subsidiaries. MMC and Kukui owned no right to claim an interest in the Poland Project itself. MMC owned no shares of MMPCO's stock. Kukui and the Unsecured Creditors' Trust of MMC were entitled to settle whatever claims they owned.

After being told repeatedly that the trustee on behalf of his estates owned the MMPCO stock and that Kukui could not speak for the trustee, this Court finds that EuroGas could have no reasonable expectation that the trustee's claims to the Poland Project were resolved by the Kukui–GlobeGas Settlement Agreement.

## 4. The trustee is acting in good faith

 The trustee moved for joint administration of the five Chapter 7 cases. This Court granted that motion and has recently amended that order to clarify the joint administration process. Joint administration is designed in large part to promote procedural convenience and cost efficiencies which do not affect the substantive rights of claimants or the respective debtor estates. *Unsecured Creditors Committee v. Leavitt Structural Tubing Co.,* 55 B.R. 710 (N.D.Ill.1985), *aff'd,* 796 F.2d 477 (7th Cir.1986). The trustee has never proposed substantive consolidation which would merge the assets and liabilities of the respective debtors. Under these facts the Court finds that the trustee has no conflict of interest based on his representation of the five jointly administered bankruptcy cases.

Moreover, based on the evidence before this Court, there is no evidence that the trustee has acted improperly in his activities on behalf of the bankruptcy estates. This Court finds that the trustee is acting in good faith in bringing Adversary Proceeding Nos. 97–4114 and 97–4155.

## 5. The financing agreement is in the best interests of the estate

11 U.S.C. § 364 states:

(a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

(d) (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

(e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant

under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

(f) Except with respect to an entity that is an underwriter as defined in section 1145(b) of this title, section 5 of the Securities Act of 1933, the Trust Indenture Act of 1939, and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security does not apply to the offer or sale under this section of a security that is not an equity security.

▉ As noted by the court in *In re Hartley*, 39 B.R. 273, 278–79 (Bankr.N.D.Ohio 1984):

Subsection (b) permits the court to authorize the trustee to obtain unsecured credit and incur unsecured debts other than in the ordinary course of business, such as in order to wind up a liquidation case, or to obtain a substantial loan in an operating case. Debt incurred under this subsection is allowable as an administrative expense under section 503(b)(1). House Report No. 95–595, 95th Cong. 1st Sess. 346–47 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 57 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5843, 6303. The fact that the Trustee is not operating the business of the debtor, thus, is no bar to the motion to obtain credit in this case.

In *Hartley*, the court considered allegations the Chapter 7 trustee should not be allowed to borrow monies on behalf of the estate from a creditor. The Court found that there was no conflict of interest between the trustee and the lending creditor which would preclude the trustee's acceptance of the proffered funds since there were no express or implied conditions that would impair the trustee's objectivity in using the funds on behalf of the estates. The court rejected any contention that "the Trustee's agreement to provide status reports is such a condition since the Trustee is already under a duty, pursuant to § 704(6) of the Code, to 'furnish such information concerning the estate and the estate's administration as is requested by a party in interest.' "

▉ Similarly, this Court finds that there is no evidence that the financing agreements create a conflict of interest for the trustee in this case. There are no limitations express or implied on the trustee's ability to act independently on behalf of his estates. The trustee has borne his burden to prove that the estates' have no recourse other than to borrow from Kukui and the Kamehameha Bishop Estate if the litigation at issue is to be maintained.

### 6. The Trustee's investigation of the McKenzie claims against Kukui

The only property or claim with value scheduled by the McKenzies in the two corporate debtor cases of LaPlata and McKenzie Energy Corp., is a claim that the pipeline previously owned by LaPlata had been improperly transferred away from LaPlata for inadequate value. In the view of the McKenzies, their claim arose as a result of a lawsuit brought by the MMC Chapter 11 bankruptcy trustee, Robert Ogle, who had sued and settled in the MMC bankruptcy for the return of the pipeline which, according to Ogle, the McKenzies themselves had improperly transferred. That settlement was duly noticed and approved by the MMC Court and incorporated into the MMC confirmed plan of reorganization. Upon his appointment to these five bankruptcy cases, Trustee Smith duly investigated the McKenzies' allegations and realizing that this Court approved transaction was the basis of the McKenzies' claims he settled whatever claims the estates held against Kukui in a Court approved bidding procedure which included Frances McKenzie as a bidder. After a hearing, the Court approved the sale of the claims to Kukui for $75,000.

Regarding the other McKenzie allegations about claims against Kukui and third parties, the trustee conferred with all counsel for the McKenzies. In addition, the trustee received

information from Kukui that reflected a number of transactions, transfers, and other corporations through which the McKenzies acted. The trustee reviewed notebooks of documents, including notebooks that had been compiled on various aspects of the MMC Chapter 11 asset investigations, the forensic accounting that had been done, and information regarding the travels of the McKenzies. The trustee obtained and reviewed boxes of documents concerning the McKenzies in order to do determine the legitimacy of any claims held by them.

In addition, the trustee contacted Howard Landa, counsel for EuroGas, on August 6, 1996, based on the McKenzies' allegations of commercial slander against them by Kukui and allegedly overheard by Landa. Landa prepared and executed an affidavit disavowing any knowledge of such alleged slanderous statement being made.

### 7. Relationship between the five McKenzie Chapter 7 bankruptcy estates

At the time of Trustee Smith's appointment, there were five McKenzie-related Chapter 7 bankruptcy cases filed on the dockets of three different bankruptcy judges. After being appointed, the trustee determined that it would save time and money to administer the cases jointly in view of the overlapping identity of the creditors for the three individuals and because LaPlata and MEUS were defunct corporations. The same creditors' matrix was filed by debtors' counsel in each of the five cases.

On May the 3, 1996, the trustee filed his motion to jointly administer the cases along with his motion to compromise the claims against Kukui and other third parties. No one objected to the motion to jointly administer the cases and this motion was approved by the bankruptcy court.

To date, the five Chapter 7 bankruptcies are for all practical purposes no asset cases. The trustee has obtained $75,000 for the estates by the sale of the claims against third parties and by the sale of the estate's interests in gas partnerships. Apart from the litigation regarding the Poland Project, no assets of significance are foreseeable in these estates. As no asset cases with substantially the same creditors to date, the trustee takes the position that there is no conflict of interest in their joint administration.

█ This Court finds that any conflict of interest among the five cases is entirely speculative at this time. There are no assets to administer. No bar date has been noticed; however, the creditors appear to be the same. On this record, there is no actual conflict of interest now or foreseeable among the five bankruptcy estates. If one arises in the future, it is the duty of the trustee to bring it to the attention of this Court.

### 8. The trustee's relationship with Kukui

As a creditor and party in interest, Kukui has a duty to provide information to the trustee related to his bankruptcy estates. Much of the time spent initially by Kukui in corresponding with the trustee and forwarding documents to the trustee was to persuade the trustee to intervene in the discharge proceedings. Much of the material provided by Kukui to the trustee, such as the accounting work papers from the MMC estate and documents from GlobeGas, were provided to Kukui with the understanding of EuroGas and Landa that copies would then be provided to trustee. These materials were and are helpful in the discharge actions and in the adversary proceedings against the defendants other than EuroGas. Kukui provided the trustee with extensive documents illustrating the historical background of the pending lawsuits, including the discharge actions. In addition to information on EuroGas related entities, Kukui provided the trustee with information on non-EuroGas defendants in Adversary Nos. 97–4114 and 97–4155, including, but not limited to, information related to Nordling, Schlegel (and his contacts with the United States), Agyagos, MCK Development and/or Jeffrey, Ltd. Kukui persisted in its efforts to persuade the trustee to make EuroGas a nominal party. The trustee on behalf of his estates rejected Kukui's efforts and sued the EuroGas defendants. In addition, the trustee has obtained access to and reviewed documents gathered by the Securities and Exchange Commission on the McKenzies.

This Court has previously ordered that the trustee and Kukui attempt to limit expenses by cooperating with discovery and the financing order itself provides for the exchange of information between the trustee and Kukui. Many of the instances of joint discovery attempts specified by EuroGas as constituting improper activities appear to be those carried out by Kukui and the trustee at this Court's direction.

## X.

**Whether, under Utah law, a Third Party Beneficiary May Bring a Cause of Action for Breach of the Duty of Good Faith and Fair Dealing**

In light of the Court's ruling on the other matters raised by the parties the Court does not reach this issue.

## XI.

**Objections by the Debtors to the Fee Applications**

■ To the extent that the trustee contends that the debtors lack standing to assert any objection to his fees because the estates are insolvent, the Court finds that in light of the denial of Michael McKenzie's discharge, he, at least, has a sufficient financial interest in reducing the administrative costs of the estate to confer standing. Any reduction in administrative costs will leave more funds for payment of creditors claims for which Michael McKenzie will remain liable post-bankruptcy. *McGuirl v. White*, 86 F.3d 1232 (D.C.Cir.1996).

That one or more estates may have claims to any proceeds related to the Poland Project, if any materialize, is not an actual conflict. If the trustee's efforts bear fruit on behalf of some but not all of these estates and there is any basis for an assertion of claims against one another by the estates, it is the duty of the trustee and the right of any party to bring that problem to the attention of the Court at that time. If an actual conflict arises between the respective estates, that is the appropriate time to challenge joint administration of the five estates by this trustee.

## XII.

**Reviewing the Fee Application Itself**

■ Pursuant to the standards set forth in *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.1977), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977), the Court considers the following factors:

**a. Time and labor required (time spent on such services).**

Applicant seeks compensation for an aggregate of 2,136.10 hours reported on the third application and 1,151.00 hours reported in the fourth application. This time was required to enable trustee to perform his duties.

**b. The novelty and difficulty of the questions presented in the case.**

This case involves difficult and uncertain areas of bankruptcy, litigation, real property, partnership, corporate, oil and gas, and other aspects of the law.

**c. The skill requisite to perform the legal services properly (whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed).**

Applicant has demonstrated the requisite skill and professional competence in bankruptcy, litigation and various matters.

**d. Preclusion of other employment due to the acceptance of this case.**

The time demands and representation in this case diverted some legal resources of applicant from existing client and new matters which might otherwise have been undertaken.

**e. The customary charges for services rendered (the rate charged for such services).**

The hourly rates for which compensation is requested are the customary and usual fees charged by applicant. It is in line with those fees charged by other firms in this geograph-

ical area for the services rendered by the attorneys involved.

**f. Contingent nature of the fee.**

This case is not based on a fixed fee. Applicant has been putting forth a substantial amount of effort, time and expense in this matter without receiving any advance payment. The entirety of this fee application and up to one-half of applicant's and trustee's accountant's and landsman's past and/or outstanding fees and expenses were incurred on a contingent basis.

**g. The amount of time involved and the results obtained.**

During the time period covered by this application, applicant was required to respond to numerous matters requiring immediate attention. In responding or attempting to respond, it was necessary for applicant to review substantial amounts of contracts, pleadings, and discovery.

**h. The experience, reputation and ability of the professionals and paraprofessionals who performed virtually all of the services in the case.**

Applicant practices full time in the area of bankruptcy, insolvency, and litigation, and enjoys a respected reputation for practice in such fields in this district.

**i. The undesirability of the cases.**

There have not been any undesirable aspects pertaining to the representation of trustee in this case.

**j. Nature and length of the professional relationship with the client.**

Floyd, Smith, Rios & Wahrlich, P.C. is the law firm in which W. Steve Smith, who is serving as trustee, is a member.

**k. Awards in similar cases (whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title).**

Applicant's requested compensation is comparable to what would be charged by other persons or firms.

Applicant also seeks interim allowance and reimbursement of expenses advanced to trustee of $37,447.78 in the third application and $32,670.01 in the fourth application. The expenses for which reimbursement is sought are reasonable and necessary.

For the foregoing reasons, this Court finds that the objections by EuroGas-related entities and the debtors to the trustee's counsel's third and fourth interim fee applications should be **DENIED.** It is therefore

**ORDERED** that the trustee's third and fourth interim applications for compensation and reimbursement of expenses are **GRANTED** subject to review on final application.

## APPENDIX

Upon the Effective date, under the Modified Plan Kukui acquired:

7.2 *Assets to be Acquired by KUKUI.* KUKUI shall acquire under Plan the following assets of the Debtor's estate:

. . . . .

(b) The right to prosecute, as a representative of the debtor's estate, appointed under Section 1123(b)(c)(B) of the Bankruptcy Code, serving on behalf of the Unsecured Creditors Trust, the claims and causes of action of the Debtor against (I) Michael McKenzie, members of his family, and corporations or other business entities related to or affiliated with the Debtor, (ii) existing and former employees, agents, representatives, professionals, and assignees of the Debtor, Michael McKenzie, Family members, corporations or other business entities related to or affiliates and mediate or immediate transferees of any of the foregoing; subject to the trust agreement governing the Unsecured Creditors Trust;

\* \* \* \* \* \*

(c) The right to prosecute, as a representative of the Debtor's estate, appointed under Section 1123(b)(3)(B) of the Bankruptcy Code, serving on behalf of the

Unsecured Creditors' Trust, either by way of objection, adversary proceeding of other appropriate means, the claims, causes of action and rights of offset of the Debtor against the holder of any Claim, if and to the extent necessary to protect any assets being transferred to KUKUI hereunder from diminution or other impairment as a consequence of such Claim ...

Section 7.10(e)–(g) of the MMC plan (as modified) describes the ownership of recovery:

Section 7.10 **Unsecured Creditors Trust:** An Unsecured Creditors Trust shall be established for the benefit of holders of Allowed General Unsecured Claims. Such Unsecured Creditors Trust shall:

. . . . .

(e) contain the claims and causes of action of the Debtor against (i) Michael McKenzie, members of his family, and corporations or other business entities related to or affiliated with the Debtor, (ii) existing and former employees, agents, representatives, professionals, and assignees of the Debtor, Michael McKenzie, family members, corporations or other business entities related to or affiliated with the Debtor, and (iii) any other persons that are insiders, affiliates and mediate or immediate transferees of any of the foregoing; but subject to the right of KUKUI (i) to prosecute such claims and causes of action as a representative of the Debtor's estate, appointed under Section 1123(b)(3)(B) of the Bankruptcy code, serving on behalf of the Unsecured Creditors Trust, (ii) to be reimbursed for all costs and expenses incurred in prosecuting such claims and causes of action *out of any recovery therefrom,* and (iii) to receive ninety percent (90%) of the net recovery from the prosecution; with the result that the Unsecured Creditors Trust shall consist of ten percent (10%) of the net recovery from such prosecution; *and further contain ten percent (10%) of the net recovery obtained by KUKUI (after payment of all costs and expenses incurred in the litigation) with respect to claims and causes of action asserted by and belonging to KUKUI (not the estate) in litigation pending or brought by KU-* *KUI against (i) Michael McKenzie, members of his family, and corporations or other business entities related to or affiliated with the Debtor, (ii) existing and former employees, agents, representatives, professionals, and assignees of the Debtor, Michael McKenzie, family members, corporations or other business entities related to or affiliated with the Debtor, and (iii) any other persons that are insiders, affiliates and mediate or immediate transferees of any of the foregoing, but only if and to the extent that such claims and causes of action are joined in the same action and litigated together with the claims and causes of action of the estate prosecuted by KUKUI pursuant hereto and as provided in Section 7.2(b) of the Plan;*

(f) contain the claims and causes of action of the Debtor against all holders of Claims and Interests (except to the extent of the claims and causes of action described in Subsection 7.10(e) and except to the extent specifically released by the Plan) and other persons; subject, however, to the limited right of KUKUI under Section 7.2(c) of the Plan to prosecute such claims and causes of action as representative of the Debtor's estate, appointed under Section 1123(b)(3)(B) of the Bankruptcy Code, serving on behalf of the Unsecured Creditors Trust, on the condition that KUKUI bear its own costs and expenses in connection with such prosecution, and on the further condition that transfers to the Unsecured Creditors Trust any proceeds or other benefits of such prosecution that may exceed the amount or nature of relief permitted to KUKUI under such Section (7.2(c);

(g) provide with respect to Subsections (e) and (f) above that (i) KUKUI shall have no duty or obligation whatsoever, either express or implied, to the Unsecured Creditors Trustee or to holders of General Unsecured Claims to prosecute such claims and causes of action; (ii) KUKUI shall have no liability or responsibility for failure to prosecute such claims and causes of action; (iii) KUKUI shall have the absolute right and power in the exercise of its sole and absolute discretion, to determine

which, if any, of such claims and causes of action are to be prosecuted and the method and manner of any prosecution or pursuit thereof, and to settle, compromise, release or forego any of such claims or causes of action under such circumstances, on such terms, or for such consideration, if any, as shall be determined by KUKUI; and (iv) KUKUI shall have no liability or obligation whatsoever to the Unsecured Creditors Trustee or to the holder of any General Unsecured Claim for any action or omission or decision taken or omitted to be taken or made in connection with any such matters, including, without limitation, any errors, mistakes, negligence or gross negligence of KUKUI in connection with such matters; . . . .

### Section 10.1 *Binding Nature*

Except as otherwise expressly provided for herein and in the Confirmation Order, the Debtor, the Chapter 11 Trustee, the Plan Administrator, the Unsecured Creditors Trustee, KUKUI, and all holders of Claims and Interests (whether or not such Claims and Interests are impaired under the Plan and whether or not such holders of Claims and Interests accept the Plan) are bound by the provisions of the Plan. On and after the Effective Date, the Debtor, the Chapter 11 Trustee, the Plan Administrator, the Unsecured Creditors Trustee, KUKUI, and all holders of Claims and Interests shall be precluded from asserting against the Debtor, its estate, assets and properties, successors and assigns, and against KUKUI and any assets and properties acquired by it under the Plan, any Claim or Interest based on any document, instrument, act, omission, transaction or other activity or any kind of nature that occurred prior to the Effective Date.